```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| JOSEPH CIOLINO,<br><br>        Plaintiff,<br><br>    v.<br><br>AMERIQUEST TRANSPORTATION SERVICES, INC.,<br><br>        Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 09-1324<br>        (JEI/AMD)<br><br>**OPINION** |

**APPEARANCES:**

HAINES & ASSOCIATES
By:  Clifford E. Haines, Esq.
     Patrick C. Campbell, Esq.
     Danielle M. Weiss, Esq.
1835 Market Street, Suite 2420
Philadelphia, PA 19103
     Counsel for Plaintiff

DILWORTH PAXSON LLP
By:  Thomas Vecchio, Esq.
     James J. Rodgers, Esq.
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
     Counsel for Defendant

**IRENAS**, Senior District Judge:

    This case involves Plaintiff Joseph Ciolino's ("Ciolino") claim that Defendant Ameriquest Transportation Services, Inc. ("Ameriquest"), a New Jersey corporation, violated the terms of Ciolino's employment contract by diluting his ownership interest in Ameriquest.[1]  Ciolino seeks declaratory relief that he is

---

    [1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

1

entitled to a current and continuing undiluted 5% interest in Ameriquest.  A one day bench trial was held on October 19, 2010.  The Court now issues this Opinion in accordance with Federal Rule of Civil Procedure 52(a)(1).

## I.

The factual recitation that follows sets forth the uncontested background facts of this case.  Findings of fact from trial will be included in the Court's analysis of Ciolino's claim.

Prior to his employment with Ameriquest, Ciolino held an executive position at Ryder Systems, with which he had been employed for twelve and a half years.  (Pl's Direct Test. at 3)

In March 1998, Ciolino and Ameriquest entered into a Memorandum of Understanding ("MOU") in connection with Ciolino's acceptance of an executive position with Ameriquest.[2]  (Compl. ¶ 5)  Pursuant to the MOU, Ciolino's compensation package included a base salary, performance bonuses, commissions, and a grant of stock options.  (*See* MOU ¶ 1)  The instant dispute centers on paragraph 1D, which was the product of extensive, hand-written alterations to the original typed text:

> Stock options amounting to 2% of the outstanding and issued shares as of the date of employment will be

---

[2]  The MOU identifies the parties thereto as Joseph Ciolino and "Amtralease Truck Leasing Services Corp."  At the time of the MOU, Ameriquest was known as Amtralease.  (Pl's Direct Test. at 5)

awarded to "employee" upon his first day of employment. The per share price of the options will be at the Initial Offering price (adjusted for stock splits) of $25 per share. The exercise date of the options will be ~~five years~~ *at offering (I.P.O.)* from the first day of employment. Anti dilution provisions will be incorporated with the options so that the options associated with the original 2% will not fall below that percentage of the outstanding stock prior to any Initial Public Offering of the company. Options will fully vest after five years *or at initial public offering within I.P.O. Guidelines*[] of employment and should the employee leave the company prior to the five year vesting period *or Initial Public Offering* he will forfeit all interest in the aforementioned stock options.

~~Additional stock options will be made available to employee as performance compensation. A pool of up to 8% of the outstanding and issued stock will be set aside for management stock options from which the performance compensation options will be issued. The 8% pool will be in addition to the aforementioned 2% stock option. Performance compensation will be awarded on [an] annual basis.~~ *Additional stock options will be made available of up to 3% of outstanding and issued stock over a 5 year period or prior to an initial public offering. Antidilution provisions will be incorporated as is stated in Item 1D regarding the original 2% stock optio[n] award . . . for a tota[l] of 5%.*[3]

---

[3] The typed portions of paragraph 1D that were crossed out by hand are indicated by horizontal line through the text, while the hand-written additions are indicated by italicized text.
  In his direct testimony, Ciolino explained the drafting of paragraph 1D as a joint effort between himself and Douglas Clark, Ameriquest's President and Chief Executive Officer ("Clark"):
> It was a joint effort. The typed portion that you see on the exhibit was drafted by Ameriquest and was in the agreement from the very first proposal we looked at earlier. As I said before, I was concerned that the extent of my anti-dilution rights should be clear, so Clark and I worked together on the speakerphone. [My wife] recorded our joint changes, read back what she'd written, and we each agreed to the language.

(Pl's Direct Test. at 12-13)

(MOU ¶ 1D)

Ciolino timely exercised his stock options between February 2000 and May 2003.[4] (Compl. ¶ 7)  His total purchases amounted to 5% of Ameriquest's stock.  Subsequently, Ameriquest issued additional shares of its stock to other shareholders, but did not offer to issue additional shares to Ciolino.[5] (Id.)  As a result, Ciolino currently owns less than five percent of the outstanding Ameriquest stock.  (*See* id.)  Ciolino's employment with Ameriquest ended in July 2004.  (Pl's Direct Test. at 2)

By letter to Ameriquest dated December 22, 2008, Ciolino sought an accounting of the outstanding shares of Ameriquest stock, as well as tender of sufficient shares, the purchase of which would restore Ciolino's ownership interest to 5%.  (Compl. ¶ 8)  Ameriquest rejected Ciolino's requests.  (Compl. ¶ 9)

---

[4] Stock certificates attached as exhibits to Ciolino's Brief in Opposition to Ameriquest's Motion to Dismiss indicate that he acquired Ameriquest stock in the following increments: (1) 400 shares on February 8, 2000; (2) 470 shares on May 15, 2002; (3) 886 shares on January 21, 2003; and (4) 558 shares on May 14, 2003.  (Pl.'s Br. in Opp. Ex. B-- Stock Certificates)

[5] Ciolino testified that his 5% interest in Ameriquest was diluted by the acquisition of National Lease, although it was not clear from Ciolino's testimony whether the transaction was dilutive because stock was part of the consideration for the acquisition or whether the acquisition was financed by a concurrent stock issuance.  (Trial Transcript at 54:1-4)  Ciolino did testify that the acquisition of National Lease resulted in a 50 to 1 stock split.  (Id.)  Ciolino also speculated that his interest was further diluted by other issuances of stock to employees and possibly other acquisitons, but he is "not privy to that information."  (Id. at 54:5-8, 55:21-25)

Ciolino initiated the instant action by filing a two count Complaint on March 23, 2009. Count I alleges that Ameriquest breached the MOU by diluting Ciolino's stock ownership interest, and seeks a declaration that Ciolino is "entitled to a current and continuing undiluted five percent (5%) interest in Ameriquest." (Compl. ¶¶ 14, 15) Count II alleges that Ameriquest violated the New Jersey Business Corporation Act by refusing Ciolino's demand to review its books and records, and asks the Court to direct Ameriquest to provide Ciolino with access to those documents. (Compl. ¶¶ 17-20)

On August 10, 2009, this Court denied Ameriquest's Motion to Dismiss the Complaint. A bench trial was held before this Court on October 19, 2010. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). *Pierre v. Hess Oil Virgin Islands Corp.*, 624 F.2d 445, 450 (3d Cir. 1980)(compliance with Rule 52(a) does not require findings of fact and conclusions of law to be stated separately in a court's opinion).

## II.

As a general rule, courts should enforce contracts as the parties intended. *Henchy v. City of Absecon*, 148 F.Supp. 2d 435, 439 (D.N.J. 2001); *Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 43 (1960). In interpreting a contract, a court must discern and implement the common intention of the parties. *Tessmar v.*

*Grosner*, 23 N.J. 193, 201 (1957). The court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose. *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 302 (1953). Under New Jersey law, extrinsic evidence is admissible to explain the meaning of contract provisions "even when the contract on its face is free from ambiguity." *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 269 (2006).

### III.

The dispute in this case centers on the interpretation of a single sentence from paragraph 1D of the MOU: "Anti dilution provisions will be incorporated with the options so that the options associated with the original 2% will not fall below that percentage of the outstanding stock prior to any Initial Public Offering of the company."[6] (MOU ¶ 1D) The question this Court must decide is whether this anti-dilution provision protected the value of Ciolino's option rights prior to exercise or whether it guaranteed Ciolino an ongoing option to maintain a 5% ownership stake in Ameriquest.

Ciolino argues that the provision entitled him to purchase a

---

[6] Pursuant to paragraph 1D, anti-dilution provisions also protect the additional stock options amounting to 3% made available to Ciolino over the specified five year period. (MOU ¶ 1D)

6

continuing 5% interest in Ameriquest at the option price until an initial public offering ("IPO").[7]  (Pl's Direct Test. at 16) Ciolino's interpretation is based on the principle that redundant contractual constructions should be avoided, the alleged intent at the time of drafting, and extrinsic evidence allegedly demonstrating Ameriquest's acceptance of his understanding of the anti-dilution provision.  Ameriquest, on the other hand, argues that the provision protected Ciolino's options prior to exercise. Ameriquest contends that the language of the contract is clear on its face and the intention of the parties at the time of drafting was for anti-dilution to protect only the stock options.

Based on the testimony and evidence presented at trial and the arguments made by the parties, the Court concludes that the anti-dilution provision protected Ciolino's stock options from dilution, but did not grant him an ongoing 5% ownership interest

---

[7]  The option price is stated as $25 per share adjusted for stock splits.  The acquisition of National Lease, discussed *supra* note 5, resulted in a 50 to 1 stock split, reducing Ciolino's option price to $.50 per share.
   The Court notes that Ciolino's interpretation of the anti-dilution provision appears to have evolved over the course of the trial.  During trial, Ciolino testified that the MOU entitled him to purchase shares in Ameriquest for $.50 per share, even though Clark had to purchase shares to maintain his 20% ownership at the then prevailing market price.  (*See* Trial Transcript at 33:9-22) However, in his Post-trial Brief, Ciolino interpreted the contract differently stating: "The phrase 'The per share price of the options will be at the Initial Offering price (adjusted for stock splits) of $25 per share' was intended to mean that Plaintiff would pay for the shares he was entitled to acquire at what was considered the fair value at that time."  (Pl's Post-trial Br. at 8)

in Ameriquest until an IPO.[8] A plain reading of the language itself indicates that by its terms the provision applies to the stock options. The MOU sets forth the number of options that Ciolino will get and specifies that anti-dilution will protect the options themselves, not the underlying stock. There is no plausible reading of the contract that would support Ciolino's contention that he is entitled to a continuing and undiluted 5% interest in Ameriquest stock.

The Court finds Ciolino's arguments in support of his interpretation unpersuasive. First, the Court does not agree

---

[8] The Court notes that the doctrine of *contra proferentem,* whereby ambiguous contract language is construed against the drafter is inapplicable here. *Contra proferentem* is a doctrine of last resort, utilized when the court is unable to determine the meaning of a term even after considering common usage and custom and the circumstances surrounding the contract's execution. *See Pacifico v. Pacifico*, 190 N.J. 258, 267-68 (2007). First, the Court is able to determine the meaning of the anti-dilution provision by considering custom, common usage, and the circumstances surrounding the execution of the MOU. Second, the doctrine is only available where the parties are not equally "world-wise and sophisticated," and in this case there is no indication of unequal bargaining power between the parties. *Id.* at 268. Third, even if the Court were to assume that Ameriquest drafted the sentence at issue in this case because it was not modified by Ciolino during their negotiations, the policy behind *contra proferentem* does not apply. The rationale behind this doctrine is that "where one party chooses the term of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning." *Id.* (internal quotations omitted) Given the extensive negotiation process between Ciolino and Clark that resulted in substantial alterations to the paragraph at issue, Ameriquest cannot be said to have chosen the terms of the contract or have more of a reason to know of uncertainties of meaning.

that the anti-dilution language is redundant. Ciolino argues that if anti-dilution protected the stock options, the phrase would be redundant as anti-dilution is inherently present since the options are expressed as a percentage. However, it is clear from the face of the MOU that Ciolino would be issued "stock options *amounting to* 2% of the outstanding and issued shares" at a specified time. (MOU ¶ 1D) (emphasis added) The percentage is simply a reference point for the number of options Ciolino would be issued. It is this specified number of options that would be protected from dilution.

Second, the Court finds Ciolino's extrinsic evidence unpersuasive. Ciolino argued that Ameriquest's Annual Reports demonstrated that Ameriquest itself interpreted the anti-dilution provision as granting Ciolino a continuing undiluted 5% interest in Ameriquest. (*See* Trial Transcript at 90-95) Although Ciolino had fully exercised his options as of April 2003, the Annual Reports for the years 2006 and 2007 state: "Some of the option awards vest over the earlier of two (2) years or upon an initial public offering and some are subject to an anti-dilution provision."[9] (*See* Exs. 8, 9 at 12) Ciolino argues that "[i]f Defendant truly believed that the antidilution rights were limited to the options themselves, there would have been no

---

[9] Clark concedes that the above quoted language "was in reference to Mr. Ciolino's options." (Trial Transcript at 94:10)

reason to continue to disclose Plaintiff's antidilution rights in any Annual Report after the 2002 Annual Report."[10]  (Pl's Post Trial Br. at 13)

The inclusion of the anti-dilution reference in the Annual Reports may show carelessness on the part of Ameriquest or its auditors for not realizing that Ciolino's options were exercised and vested, but it does not prove that Ameriquest interpreted the anti-dilution provision as granting Ciolino an undiluted 5% interest in Ameriquest stock.  The Annual Reports plainly state that "option awards," not shares of stock acquired therefrom, "are subject to an anti-dilution provision."  (*See* Exs. 8, 9 at 12)  In addition, the Annual Reports reference Clark's right to purchase additional shares of stock to maintain his interest in Ameriquest by unambiguously referring to his "20% equity interest in the Company" and not an anti-dilution right.  (*See* id.)

Third, the Court is not persuaded, as Ciolino argues, that "no reasonable businessperson in the position of Plaintiff would take the enormous risk of leaving a great employment situation

---

[10] Ciolino also points out that the reference to anti-dilution is deleted from the 2008 Annual Report issued two months after the filing of the instant action, implying that the deletion was done to sure-up Ameriquest's newly-fabricated interpretation of the anti-dilution provision in light of the law suit. (Trial Transcript at 90-92)  According to Clark, the inclusion of the reference to anti-dilution in the 2006 and 2007 Annual Reports was an error that was corrected by Ernst & Young, the new auditors retained by Ameriquest to prepare the 2008 Annual Report.  (Id. at 91-92)

and moving across the country to launch a start-up business without the assurance that he would not be frozen out of a meaningful ownership interest some day in the future." (Pl's Post-Trial Br. at 14)  There are any number of reasons why a "reasonable businessperson in the position of Plaintiff" might want to be involved in a start-up business, and the Court will not support an unreasonable interpretation of the anti-dilution provision in order to justify Ciolino's notions of a fair employment contract.[11]

The Court further finds that it is Ciolino's interpretation of the anti-dilution provision that does not make business sense. Allowing Ciolino to maintain his 5% interest at the exercise price would be dilutive to the other shareholders if Ameriquest ever sold stock at a price greater than Ciolino's exercise price. For example, had Ciolino been allowed to make such a purchase as of December 31, 2009, he would have acquired such stock at a 93% discount off the value of the shares at the time. (Trial Transcript 33:12-22)  This potential dilution would deter potential investors from purchasing stock and prevent Ameriquest

---

[11] According to Clark, the intention of the parties was to include stock options as part of Ciolino's employment compensation to induce him to work for Ameriquest and to provide him "with an extra incentive to help in growing the value of the company." (Clark Direct Testimony at 9)  Ameriquest argues that as an employee benefit, Ciolino's right to purchase Ameriquest stock pursuant to the MOU should not extend beyond the time of his employment with Ameriquest. (Def's Trial Br. at 5)

from using stock as consideration for acquisitions or other transactions, as any stock so purchased could be subject to immediate dilution.  As this Court explained during trial, if the initial investors all had the right to maintain an equity interest through stock purchases at substantially discounted rates, "the company could never really get new investment other than a public offering because what investor would put money at full value in if the initial people could just, after he did it, bulk up their stock with cheap stock."  (Trial Transcript at 32:2-6)  Moreover, if no public offering occurs, Ciolino's interpretation of the provision would mean that he would have a perpetual right to purchase Ameriquest stock at a significantly discounted price, a right which could conceivably be passed on to his heirs.  (*See* Clark Direct Test. at 9; *see also* Trial Transcript at 31:12-15)

Therefore, because the Court finds that the provision at issue was intended to protect Ciolino's stock options from dilution prior to exercise, and Ciolino fully exercised his options as of 2003, the anti-dilution provision had no further effect after that date.  Accordingly, Ameriquest did not breach the MOU by issuing additional stock without providing Ciolino the opportunity to purchase additional stock.[12]

---

[12]  In Count II of his Complaint, Ciolino requests an inspection of books and records "to determine the value of Ciolino's interest in Ameriquest, to determine the extent of his

12

**IV.**

For the reasons stated above, Judgment will be entered in favor of Ameriquest. An appropriate Order accompanies this Opinion.

Dated: November 22, 2010

                                        s/Joseph E. Irenas
                                        **JOSEPH E. IRENAS, S.U.S.D.J.**

---

holdings, and to determine whether the corporation is being properly managed." (Compl. ¶ 19) In light of the Court's holding that Ciolino is not entitled to a continuing undiluted 5% interest in Ameriquest, Ciolino's reason for seeking inspection is moot and the Court will enter Judgment on Count II in favor of Ameriquest.